**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| JULIA RINGERING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18-cv-3090 |
| | ) | |
| COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Julia Ringering appeals from the denial of her application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g).  Ringering filed her application for Disability Benefits on October 9, 2009.  The Commissioner denied her claim.  This Court reversed and remanded Commissioner's decision for further proceedings.  Ringering v. Commissioner of Social Security, Ill. C. D. Case No. 13-3024 (Ringering I), Opinion entered August 4, 2015 (Case 13-3024 d/e 21) (Ringering I Opinion) included in Certified Copy of Transcript of Proceedings (d/e 6 and d/e 7) (R.), at 528-84.  The

Commissioner again denied Ringering's application on remand. Ringering has again filed this action for judicial review.

The parties consented to proceed before this Court. <u>Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered August 29, 2018 (d/e 12)</u>. Ringering filed a Motion for Summary Reversal (d/e 16), and Defendant Commissioner of Social Security filed a Motion for Summary Affirmance (d/e 21). For the reasons set forth below, the decision of the Commissioner is AFFIRMED in part and REVERSED in part. The decision is affirmed except with respect to the physical RFC finding. The case is remanded for development of additional evidence regarding Ringering's physical residual functional capacity.

## <u>STATEMENT OF FACTS</u>[1]

Ringering was born on January 1, 1970. Ringering completed high school. She worked in various clerical, administrative, and sales positions at automobile dealerships. She also worked as a cashier and in the paint department at a Wal-Mart. She last worked on December 26, 2007. R. 48, 57, 453, 458. Ringering suffers from degenerative disc disease, bipolar

---

[1] The statement of facts is based in part on the Statement of Facts in the Report and Recommendation entered in Ringering I (Case No. 13-3024 d/e 20). This Statement of Facts includes a summary of additional material cited by the parties and additional material submitted by Ringering.

disorder, posttraumatic stress disorder (PTSD), and alcohol abuse.  R. 29.

Ringering filed her application for Disability Benefits on October 6, 2009.

She alleged that she became disabled on December 26, 2007.  Ringering

worked sufficient quarters to remain insured for Disability Benefits through

March 31, 2009.  R. 27.  Ringering is married.  Between 2007 and 2009,

she lived with her husband and their five children.  R. 45.

On April 23, 2007, Ringering saw psychiatrist Dr. Sanjay K. Nigam,

M.D., for a psychiatric evaluation.  Ringering reported nightmares,

flashbacks, depression, thoughts of suicide and hypersomnia.  Ringering

reported that she blamed herself for the suicide of her fiancé in April 1995.

She reported that she began to seek psychiatric treatment in 1997.  She

reported episodes of depression in which she experienced increased sleep,

low energy, feelings of guilt, poor concentration, weight gain, psychomotor

retardation, and lack of motivation.  She also reported suicidal ideations.

She reported having panic and anxiety attacks.  She admitted having three

panic attacks on the day of the evaluation.  She denied any hallucinations

or paranoid delusions.  Dr. Nigam noted that Ringering was calm,

cooperative, and pleasant.  Her personal hygiene was fair.  Dr. Nigam

diagnosed bipolar disorder, possibly cyclothymia.  He assigned her a

Global Assessment of Functioning (GAF) score of 55. The GAF score was

a measure of a clinician's judgment of an individual's overall level of functioning on a hypothetical continuum of mental health and illness. American Psychiatric Assn, <u>Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Rev.) (DSM IV-TR)</u>, at 32-35. [2]  A GAF score from 51 to 60 indicated either "moderate symptoms . . . or moderate difficulty in social, occupational, or school functioning." <u>Id.</u> at 34.  Dr. Nigam changed Ringering's medications.  R. 199-201.

Ringering continued to see Dr. Nigam throughout 2007 and into 2008. On May 9, 2007, and May 21, 2007, Ringering complained to Dr. Nigam of difficulty sleeping and not being motivated to clean the house.  R. 202-03. On May 9, Ringering said she was feeling overwhelmed trying to arrange a sleep-over birthday party.  On May 9, 2007, Dr. Nigam noted that Ringering's appearance and grooming was fair, her mood was euthymic, her thought process was logical and goal oriented, and her judgment and insight were good.  Dr. Nigam gave her a GAF score of 55.  R. 202.  On May 21, 2007, Ringering said the party was for her son, and she had no problems with the party.  She reported that after the party she went golfing and cleaned up the house.  She said she got a job at Walmart.  Dr. Nigam

---

[2] The American Psychiatric Association no longer recommends use of the GAF score.  <u>Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013)</u>, at 16.

again noted that Ringering's appearance and grooming was fair, her mood was euthymic, her thought process was logical and goal oriented, and her judgment and insight were good. Dr. Nigam gave her a GAF score of 55-60.  R. 203.

On August 8, 2007, Ringering reported racing thoughts.  Dr. Nigam noted that her thought process was logical and goal oriented and her judgment and insight were good.  Dr. Nigam again gave her a GAF score of 55.  Dr. Nigam recommended counseling.  R. 205.

On September 5, 2007, Ringering again reported feeling anxious and paranoid, and having racing thoughts.  Dr. Nigam noted that she had a depressed mood, an appropriate appearance and affect, coherent speech, logical thought processes, normal memory, good judgment and fair insight. R. 206.  Dr. Nigam again adjusted her medications.

On October 8, 2007, Ringering reported that she stopped drinking. She reported that she was sleeping better, but still experienced drowsiness.  Dr. Nigam noted that her speech was coherent, her thought process was logical, her memory was normal, her insight was fair, and her judgment was good.  Dr. Nigam gave her a GAF score of 60.  R. 207.

On January 4, 2008, Ringering saw Dr. Nigam.  Ringering reported that the holidays were not good for her.  She reported that she had stress

at work at Wal-Mart, and she quit.  She reported that she was drinking and was not taking her medications.  Dr. Nigam and Ringering discussed the adverse interaction between alcohol and her medications and the effect on her mental illness.  Dr. Nigam noted that she was alert and calm, she had a sad mood, her thought process was concrete, her judgment and insight were poor, and her ability to abstract was limited.  Dr. Nigam gave her a GAF score of 45.  R. 208.  A GAF score of 41 to 50 indicated either serious symptoms or any serious impairment in social, occupational, or school functioning.  DSM IV-TR, at 34.

On January 4, 2008, Dr. Nigam wrote a letter To Whom It May Concern regarding Ringering.  Dr. Nigam wrote that Ringering was suffering from bipolar disorder with episodes of manic and depressive symptoms.  He stated that she required extra support from her family during these episodes.  R. 211.

On February 4, 2008, Ringering saw Dr. Nigam.  Ringering reported getting arrested for Driving Under the Influence of Alcohol (DUI) and resisting arrest.   Her driver's license was suspended.  She reported that the officer shocked her with a Taser.  Dr. Nigam stated on that date that Ringering had a good appearance and an improved mood; her cognition was within normal limits; and she had good judgment, fair insight, normal

affect, and a logical and goal directed thought process." Dr. Nigam assigned GAF score of 50 at this visit. R. 209.

On February 26, 2008, Ringering saw an orthopedic surgeon, Dr. Lukasz Curylo, M.D. because of problems with her neck. On examination, Dr. Curylo found limited range of motion in her neck and decreased strength and sensation in her left arm and fingers. An MRI showed two large disc herniations at C5-6 and C6-7. The herniations caused neuro-compression and significant canal narrowing. Dr. Curylo discussed treatment options with Ringering, including possible surgery. R. 375. Ringering decided to have surgery on her neck. On or about March 4, 2008, Dr. Curylo performed a cervical fusion operation in which he fused C5-C7 vertebrae. R. 370.[3] Ringering wore a cervical collar after the operation.

On March 24, 2008, Ringering saw Dr. Curylo for a postoperative follow-up examination. Ringering reported that her numbness was resolved. She said that she was happy with the results. Dr. Curylo stated that Ringering had "Excellent healing with good results." Dr. Curylo refilled her pain medication prescriptions. R. 370.

---

[3] Dr. Curylo's notes for the March 24, 2008 follow-up examination state that Ringering was three weeks postoperative on that date. Dr. Sohn's notes state that the surgery was on March 4, 2008. R. 367.

On March 31, 2008, Ringering saw Dr. Nigam. She reported neck pain. She reported trouble sleeping and having racing thoughts. Dr. Nigam noted that Ringering had a better mood, a normal affect, and a logical goal directed, and sequential thought process." R. 210. Dr. Nigam also stated Ringering had fair judgment and insight. R. 210.

On May 12, 2008, Ringering saw Dr. Curylo for a second follow-up examination after her surgery. Ringering reported much less pain. She reported that she was taking no pain medication. She complained of mild occasional numbness in her left thumb and first and second fingers. Her symptoms were intermittent. On examination, Dr. Curylo found that the incision was well-healed. He noted no pain in range of motion. Dr. Curylo told Ringering that she no longer needed to wear the cervical collar. Dr. Curylo refilled Ringering's pain prescriptions. R. 371-72.

On May 22, 2008, Ringering saw a psychiatrist Dr. Kapal Datta, M.D., for a psychiatric evaluation. Ringering rated her depression as a "7 out of 10." She reported that her anxiety varied. Dr. Datta gave her a GAF score of 60. Dr. Datta adjusted her medications. R. 213-17.

Ringering saw Dr. Datta several times from May through October 2008. On June 16, 2008, Ringering said she was better and had been walking and riding her bike. R. 218, 221. On July 28, 2008, Ringering said

she was doing very well and was cutting down on caffeine.  R. 222.  In September 2008, Ringering reported that she and her husband filed for bankruptcy relief.  In October 2008, Ringering reported that she could not hold a job.  Ringering stated that she had been sober since January 2008. R. 218-225, 228-229.

On September 30, 2008, Ringering was hospitalized after reporting sadness, discouragement, low self-esteem, worthlessness, loss of pleasure, anxiety, and anger.  R. 314-17.  She was discharged from inpatient care on October 9, 2009.  At the time of discharge, Ringering reported some continuing depression, anxiety, and anger, but denied any suicidal ideations.  Ringering was assessed with a major depressive disorder and alcohol abuse in initial remission.  She was given a GAF score of 60, indicating moderate symptoms or moderate functional limitations.  R. 314-17.

On October 20, 2008, Ringering saw Dr. Datta.  She said she was in an intensive outpatient program (IOP).  She had attended six sessions.  Dr. Datta advised engaging in physical activity.  R. 228-29.

Dr. Shazia Malik, M.D., wrote a letter To Whom It May Concern dated November 4, 2008, stating that Ringering completed 21 hours of a dual

diagnoses program for her mental problems and her problems with substance abuse.  R. 292.

On November 17, 2008, Ringering saw Dr. Datta.  Ringering said the IOP sessions were helping.  She said she was learning how to cope.  She was cleaning the house, biking, and taking care of her children.  R. 230. Dr. Datta also made a list in his notes that he entitled "Inconsistencies/Discrepancies."  R. 231.  Dr. Datta listed under this heading, among other things:  Ringering was guarded, she was not able to hold a job, her mother and sister told her she was lazy and did not look after her children, she lost her job in December 2007 and did not like her manager, she stopped attending IOP, she said her insurance would not authorize more care, she said she did not see a psychiatrist in IOP, the IOP records showed that she saw a psychiatrist.  R. 231.

On November 17, 2008, Ringering saw Dr. Curylo about her neck. Ringering reported increasing axial neck pain.  She also reported suboccipital pain and intermittent numbness in her left hand.  Ringering denied any weakness.  Dr. Curylo stated that Ringering may have had adjacent level degeneration with cervicalgia and possibly facet disease superior to the location of her March 2008 fusion.  Dr. Curylo referred Ringering to a pain specialist.  R. 369.

On December 8, 2008, Ringering saw Dr. Datta. Dr. Datta noted that Ringering's affect was okay, her mood was much better, and she was sleeping better. R. 234-35. On December 29, 2008, Ringering saw Dr. Datta again. Ringering reported having better energy. Ringering reported that her Christmas was "great." R. 236-37. On January 26, 2009, Ringering told Dr. Datta that things were better. She said her meds helped her. R. 238.

On January 26, 2009, Ringering also saw a pain specialist, Dr. Daniel Sohn, M.D. Dr. Sohn noted neck and shoulder girdle myofascial pain. On examination, Ringering's stance, gait, and position were "a little slow." Ringering was tender to palpation in the neck and shoulder girdles. Her neck range of motion was poor to fair with flexion limited by pain, but extension and rotation were good without discomfort. She had decreased sensation in the upper extremities. Dr. Sohn prescribed physical therapy and medication. Dr. Sohn mentioned that trigger point injections would be considered in the future. Dr. Sohn advised Ringering to remain active with her usual activities. Dr. Sohn advised against bed rest. R. 367-68. Dr. Sohn recommended continuing "appropriate exercises as discussed." R. 368.

Ringering continued to see Dr. Datta in 2008 and 2009. R. 213-50. On March 30, 2009, Ringering reported that therapy was helpful. Ringering reported problems at home because of the bankruptcy. She reported negative self-esteem, but she also reported that the medications helped, she was having no anxiety attacks, and her eating and sleeping habits were better. She said that she was cleaning house, visiting with friends, and attending soccer practice with her children. R. 240-41. On May 18, 2009, Ringering reported having lots of anxiety attacks. Ringering reported fighting and anger. R. 242. Dr. Datta listed Ringering's diagnosis as bipolar affective disorder and an adjustment disorder (mixed). Dr. Datta indicated that Ringering was doing much better, and her mood was better. R. 244.

On April 21, 2009, Ringering saw Dr. Sohn. Ringering reported that the physical therapy hurt. Ringering reported that she continued to follow through on a home exercise program. On examination, Ringering was alert, and in a stable mood. Ringering's head and neck appeared normal. Her range of motion in her neck was decreased in left rotation and extension. She was tender to palpation on the left neck and shoulder. Her upper extremity strength was intact, but she had some pain in her left shoulder girdle with manual muscle testing. Dr. Sohn gave Ringering three

trigger point injections.  Dr. Sohn also renewed her medications and directed her to continue her exercises.  Dr. Sohn again advised Ringering to remain active, avoid bed rest, and continue appropriate exercises. R. 362-63.

On May 19, 2009, Ringering saw Dr. Sohn again.  On examination, Ringering's stance, gait, and position appeared to be normal.  She had fair range of motion with pain in the left neck.  She was tender on palpation in the left neck and shoulder girdle.  Her upper extremity strength was intact. Dr. Sohn administered one trigger point injection.  He added valium to her medications, to be taken at night.  He again advised her to remain active with her usual activities; he advised against bed rest; and he recommended appropriate exercises that they had discussed.  R. 359-60.

On June 23, 2009, Ringering saw Dr. Sohn.  Ringering reported that she had been doing "a lot of travelling for family issues to Florida and Texas."  She said she was tired due to the trips.  She reported that the trigger injections had been helpful.  She reported that her pain was much better on the left.  She reported more pain on the right at this visit.  She stated the pain in the right side may have been due to her trips.  On examination, her stance, gait, and position changes were normal, the range of motion in her neck appeared to be good.  She was tender to palpation on

the right neck, but non-tender otherwise.  Her upper extremity strength was intact, but her upper extremity sensation was decreased.  Dr. Sohn renewed her medications.  He advised her to remain active with her usual activities; he advised against bed rest; and he advised to continue her medications and exercises.  R. 357.

On August 17, 2009, Ringering saw Dr. Sohn.  Dr. Sohn administered five trigger injections.  Ringering told Dr. Sohn that she had been very active over the summer.  She had increased pain for the last three weeks.  Ringering said that she also has started having headaches and radiating pain down her left arm to the thumb and first and second fingers of the hand.  Dr. Sohn recommended that she refrain from overactivity and high impact sports, but also recommended that she continue her usual activities and recommended exercises.  Dr. Sohn ordered a nerve conduction study of her left extremity.  R. 351-52, 355.[4]

On September 11, 2009, Ringering saw Dr. Sohn again.  Dr. Sohn reported that the nerve conduction study showed normal nerve conduction with some borderline measurements.  R. 351.  Dr. Sohn ordered an MRI of Ringering's cervical spine.  The MRI was conducted on November 17,

---

[4] The ALJ referred to some of this information on a nurse's note dated July 27, 2009.  R. 355.  The nurse's note is typed.  Also on the page, is a handwritten note dated "8/17/09."  The Court interprets the handwritten note to be those of Dr. Sohn from the August 17, 2009 examination.

2009.  The results showed minimal disk bulging of the upper cervical segments without obvious stenosis or cord compression.  The results also showed a congenitally narrow spinal canal.  R. 378.

On September 18, 2009, Ringering was admitted to another IOP.  Dr. Datta referred her to the program because of his concerns about her manic symptoms and her cravings to drink and engage in promiscuity.  Ringering was assessed with low mood, feelings of helplessness, hopelessness, somatic complaints, decreased sleep, decreased appetite, excessive worry, racing thoughts, difficulty concentrating, poor impulse control, irritability, and outbursts of anger.  She reported some suicidal ideations.  She was given a GAF score of 45, indicating serious symptoms or serious functional limitations.  R. 309-10.

On September 20, 2009, Ringering was examined by psychiatrist Dr. Malik.  On examination, Ringering was alert and oriented.  Her speech was coherent.  Her thought process was logical and goal oriented.  Her remote memory was grossly intact.  Her intellect was average.  Her concentration was fair.  Dr. Malik diagnosed bipolar affective disorder, depressed, and alcohol dependence in partial remission.  Dr. Malik assigned a GAF score of 55, indicating moderate symptoms or moderate functional limitations.  R. 311-12.  Dr. Malik planned to continue the

intensive outpatient program, recommended AA meetings, and adjusted her medications.  R. 313

Ringering apparently attended the IOP sessions until November 5, 2009.  R. 309.  At the time of discharge, Ringering was stable without any suicidal or homicidal ideations.  She was assigned a GAF score of 65.  R. 310.  A GAF score of 61 to 70 indicated "some mild symptoms . . . or some difficulty in social, occupational, or school functioning, but generally functioning pretty well . . . ."  DSM IV-TR, at 34.

On November 23, 2009, Ringering saw Dr. Sohn.  Dr. Sohn administered an epidural steroid injection into the cervical spine.  Ringering underwent a C4-5 Transforaminal Epidural Steroid Injection (TFESI) on November 3, 2009.  Ringering reported about a 50% improvement in her pain, but she still had pain in her neck and left shoulder girdle area. Ringering still took 4 to 5 Percocet per day.  On examination, Ringering was in a calm and stable mood.  Her stance, gait, and position changes appeared normal.  Her range of motion was very decreased.  Her upper extremity strength was intact.  Her left trapezius was very tender to palpation.  She reported tingling in three of her left fingers, but her sensation to light touch was intact in those fingers.  Dr. Sohn administered a trigger point injection and ordered another C4-5 TFESI.   R. 347.

On November 29, 2009, Ringering saw Dr. Datta. She reported that she was working out on an exercise bike. Her mood was better. Her sleep was okay. She was advised to cut down on caffeine. R. 250.

On January 12, 2010, Ringering saw Dr. Sohn. Ringering reported that the C4-5 TFESI temporarily caused increased pain, but her pain had dropped from 6/10 to 3-4/10. She reported muscle spasms in her left shoulder girdle muscle that responded well to her medications. On examination, her stance, gait, and station appeared normal. Her range of motion in her neck was decreased to the left. Her upper extremity strength was intact. Her left shoulder active range of motion was good, but with some pain. Her upper extremity sensation was decreased on the left in a C6 distribution. Ringering would not consider more shots at this time. Dr. Sohn prescribed medications and told her to return in two months. R. 341-42.

On February 21, 2010, state agency psychologist, Dr. S. Hill, Ph.D., completed a Psychiatric Review Technique. R. 254-67. Dr. Hill opined that Ringering's affective disorders and anxiety related disorders were not severe. R. 254. Dr. Hill opined that Ringering had depression. R. 259. Dr. Hill opined that Ringering had mild difficulties maintaining concentration, persistence or pace, but no other functional limitations as a

result of her mental condition.  R. 264.  Dr. Hill noted at the end of the

Technique,

> Claimant stable at exam of 3/30/09.
> Improvements noted
> Claimant's allegations, credible.
> Impairment not severe.

R. 266.

On March 4, 2010, Dr. Datta completed a form entitled Social

Security Administration Listing of Impairments.  R. 269-71.  Dr. Datta

opined that Ringering became disabled prior to 2008.  Dr. Datta opined that

Ringering had ongoing symptoms of psychomotor agitation or retardation.

Dr. Datta opined that Ringering's condition resulted in marked difficulties

maintaining social functioning, and marked difficulties maintaining

concentration, persistence, or pace; and repeated episodes of

decompensation, each of extended duration.  R. 270.  Dr. Datta indicated

that Ringering had one or two episodes of decompensation.  R. 271.

Dr. Datta checked a box indicating that Ringering's condition met the

Social Security Administration's Listing § 12.04 for Affective Disorders.

R. 270.   The Social Security Administration's analysis of disability

considers, at one point, whether a person is so significantly impaired he

would be deemed disabled without regard to his age, education, or work

experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this

requirement, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 Listing of Impairments. Each impairment identified in the Listing of Impairments is referred to as a "Listing." Section 12.04 sets forth the Listing for affective disorders such as depression and bipolar disorder.

On April 23, 2010, a psychologist, Dr. M.W. DiFonso, Psy.D., completed a Psychiatric Review Technique. R. 275-88. Dr. DiFonso opined that Ringering had a history of major depressive disorder. R. 278. Dr. DiFonso opined that there was insufficient evidence in the record to establish any functional limitations from Ringering's mental condition. R. 285. Dr. DiFonso opined that Ringering's statements were only partially credible. Dr. DiFonso opined that Dr. Datta's opinions on the Social Security Administration Listing of Impairments form, R. 269-71, were inconsistent with his treatment notes and not otherwise supported by the record. R. 287. Dr. DiFonso stated that, "No objective findings are presented to substantiate this claim." R. 287.

On April 28, 2010, substance abuse counselor Jill Wright from the Montgomery County, Illinois, Health Department conducted a drug/alcohol assessment of Ringering. Wright concluded that Ringering did not present sufficient evidence of current substance abuse to warrant treatment.

R. 294.

On June 10, 2010, Dr. Datta wrote a letter "To Whom it May Concern." Dr. Datta stated that Ringering had been his patient since May 22, 2008. Dr. Datta stated that Ringering had bipolar affective disorder; major depression, recurrent; episodic hypoglycemia; substance abuse (possibly self-medication to deal with underlying mental issues); and adjustment disorder, mixed. Dr. Datta listed Ringering's medications Seroquel, Pristiq, Lamictal, and Klonopin. R. 290.

On July 15, 2010, Ringering saw Dr. Sohn. Ringering reported increased neck pain and headaches. Ringering reported that she had been moving and doing a lot of cleaning, scraping, and painting at the new house. On examination, Ringering was pleasant, alert, and in a stable mood. Her range of motion was fair with pain in the neck and shoulder girdle. Ringering was tender to palpation on the left shoulder girdle. Her left upper extremity strength was intact. Dr. Sohn diagnosed a flare-up due to increased activities. Dr. Sohn prescribed Vicodin. R. 333.

On September 14, 2010, Ringering saw Dr. Sohn. Ringering said she had pain in her neck and left upper extremity. She had still been scraping and painting the new house. On examination, Ringering had a stable mood. Her stance, gait, and position changes appeared normal.

Her head and neck were stiff with poor range of motion and pain. Ringering was tender on palpation in her left neck and shoulder girdle. Her upper extremity strength was intact. Sensation was decreased in left hand and first three fingers. She was in moderate distress due to the neck pain. Dr. Sohn increased her dosage of Vicodin and ordered an MRI. He recommended continuation of usual activities and appropriate exercises. He recommended against bedrest. R. 328.

On December 2, 2010, Ringering saw Dr. Datta. Ringering said that she was doing much better. She also said that she was depressed and her mood was not good. She said she was moving into a new house. R. 305.

On December 2, 2010, Ringering also saw Dr. Sohn. Ringering complained of left neck, shoulder, and arm pain with some residual numbness in the first and second fingers of the left hand. An MRI performed in September 2010 showed the C5-C7 fusion with stenosis at C4-5 and some narrowing at C3-4. R. 324, 378. Ringering reported that she had been busy rehabbing her new home. She had been cleaning, scraping wallpaper and painting. Dr. Sohn stated that this activity could be causing her discomfort. Ringering reported that she was sleeping fairly well. R. 324.

On examination, Ringering's stance, gait, and changes in position appeared normal. She was tender to palpation of the left neck and shoulder girdle. She had pain with flexion, right rotation, and bilateral side bending. Her upper extremity strength was intact. She had some weakness in her fingers. She had some decreased light touch sensitivity in her right thumb and first and second finger. Dr. Sohn administered a T1-2 interlaminar epidural injection. Ringering was also taking Norco for pain. Dr. Sohn recommended continuing her usual activities and appropriate exercises and advised against bedrest. R. 324-25.

On February 14, 2011, Ringering saw Dr. Sohn. Ringering said that the December 2, 2010 injection helped some with her pain, but her pain was recurring. She reported doing exercises and stretches at home and cutting back on heavy work at home. On examination, Ringering's stance, gait, and changes in position appeared normal. Her range of motion was fair to poor with some pulling and pain in the left shoulder. She was tender to palpation with triggering in her left levator scapula. Her upper extremity strength was intact. Dr. Sohn administered trigger point injections. R. 696.

On April 28, 2011, Ringering saw Dr. Sohn. Ringering reported that the December 2, 2010, trigger point injection helped for seven days, but after that, the pain slowly returned. She had numbness in her left thumb

and first and second finger.  She was trying to walk daily, weather permitting.  On examination, her stance, gait, and position changes appeared normal.  She had extreme tenderness on palpation in her neck muscles.  She had pain and stiffness in her neck flexion, extension, rotation, and side bending.  The pain was worse to the left.  Her upper extremity strength was intact, but she had pain with 90-degree forward flexion and shoulder abduction.  Dr. Sohn administered five trigger point injections.  Dr. Sohn recommended continuation of usual activities and exercises and advised against bedrest.  R. 698.

On May 11, 2011, Ringering saw Dr. Malik.  Ringering said she had down days, but they were not as frequent or severe.  Ringering said her mood was generally good. She reported that she slept from 10:30 to 7:30.  She reported that she had some mild panic symptoms.  Ringering said she had been sober for three years.  R. 782.

On June 20, 2011, Ringering saw Dr. Malik.  She said that she felt cranky and mean.  She said she snapped at the children.  She said she was not sleeping well, and her anxiety was high.  She said she had been having nightmares for three to four weeks.  She denied impulsive shopping.  She denied any suicidal or homicidal ideations.  R. 783.

On July 18, 2011, Ringering saw Dr. Malik. Ringering said she was no longer cranky, mean, or snappy. She said her anxiety was high. She reported insomnia with panic attacks. She denied any suicidal or homicidal ideations. She said she did some impulsive shopping. R. 784.

On July 18, 2011, Ringering also saw Dr. Sohn. Ringering stated that the April 28, 2011 injections provided pain relief for two to three weeks. Ringering said her pain varied from day-to-day. She rated her pain as moderate. The pain started in her left neck and shoulder and radiated down through her left arm to her wrist. She still had numbness and tingling in her left thumb and first and second finger. She said that her sleep varied. She said that once she fell asleep, she stayed asleep. She said that she stopped rehabbing her house. Her mother and sister took over.

On examination, Ringering was alert, pleasant, and in a stable mood. Her stance, gait, and position changes appeared normal. She had mild tenderness on palpation in her left neck and shoulder girdle. She had pain with neck flexion, and stiffness but no pain with other neck movements. She had no pain with shoulder abduction and rotation. Ringering deferred more injections. Dr. Sohn recommended remaining active and against bedrest. She said that she would continue her pool and upper extremity exercises. R. 700.

On August 22, 2011, Ringering saw Dr. Malik. Ringering said a new medication made her feel paranoid. Her anxiety was still high, 8 on a scale of 0 to 10. Her panic symptoms at night were not as bad. She had occasional nightmares. Her energy had improved on the new medication. She still shopped impulsively. She said that she still had up days and down days She said she would be fine and then she would be tearful. Dr. Malik started Ringering on lithium. R. 785-86.

On August 22, 2011, Dr. Malik also completed a questionnaire and a form entitled "Medical Assessment of Ability to do Work-Related Activities (Mental)" (August 22, 2011 Form). R. 279-83.[5] In response to the questionnaire, Dr. Malik opined that Ringering suffered from bipolar disorder and depression. Dr. Malik assessed a current GAF score of 45-50. Dr. Malik opined that Ringering had poor memory, sleep disturbance, mood disturbance, emotional liability, recurrent panic attacks, generalized persistent anxiety, decreased energy, social withdrawal or isolation, and other symptoms. He opined that she had marked difficulties in maintaining social functioning and concentration, persistence or pace. R. 382-83. Dr.

---

[5] The Report and Recommendation in Ringering I erroneously stated that Dr. Datta completed the August 22, 2011 Form. See Report and Recommendation (Case. No. 13-302 d/e 20), at 27-28. Dr. Malik completed this Form. The answer to the final question quoted above shows that Dr. Malik completed it.

Malik stated that her first contact with Ringering was in February 2011. R. 382.

Dr. Malik opined on the August 22, 2011 Form that Ringering had poor use of judgment, poor ability to deal with work stress, poor ability to function independently, and poor ability to maintain attention and concentration. Dr. Malik also opined that Ringering had poor ability to understand, remember, and carry out job instructions due to problems with concentration and memory. Dr. Malik opined that Ringering had poor or no ability to behave in an emotionally stable manner, to relate predictably in social situations, and to demonstrate reliability. R. 379-81.

The August 22, 2011 Form concluded with this question:

In your professional opinion, would the limitations you noted on these questionnaire (sic), have been in existence since the claimant's date last worked 12/26/07 and prior to 3/31/09, her date last insured for Social Security Benefits?

In response, Dr. Malik wrote, "Started seeing me 2/11. Saw S.K. Datta ptt in 2009." R. 381.

On October 3, 2011, Ringering saw Dr. Sohn for a follow-up and prescription refill. She said she had a flare-up of lower back pain. She ran out of hydrocodone. On examination, she was alert, pleasant, and had a stable mood. Her stance, gait, and position changes were slow and stiff. She had stiffness but no pain on back flexion. Her back extension was

poor with pain.  She was tender on palpation in her right low back at the sacroiliac (SI) joint, and in her thoracic paraspinals and left trapezius.  Her extremity strength was intact.  Straight leg testing was negative.  Dr. Sohn administered an injection into her right sacroiliac joint.  Dr. Sohn recommended continuation of usual activities and exercises, but against bedrest.  R. 702.

On October 31, 2011, Ringering saw Dr. Sohn.  Ringering reported that the October 3, 2011 injection provided 100% improvement.  She reported only an occasional twinge in her lower back.  She said, however, that for five days she has had pain in her mid-cervical spine and shoulder girdle.  She also reported decreased strength.

On examination, Ringering was alert, pleasant, and in a stable mood.  Her stance, gait, and position changes appeared normal.  She had tenderness on palpation in her mid-cervical muscles and left shoulder girdle.  She had pain with 90-degree forward neck flexion, shoulder abduction, and external shoulder rotation.  Her back flexion and extension caused pain.  Her lower extremity strength and sensation were intact.  Dr. Sohn administered five trigger point injections.  Dr. Sohn told Ringering to continue her core conditioning.  R. 704.

On October 31, 2011, Dr. Sohn also completed a questionnaire. R. 394-85. In response to the questionnaire, Dr. Sohn opined that Ringering suffered from chronic neck pain post C5-C7 fusion with stenosis and myofascial pain. He opined that she suffered from several symptoms, including fatigue, pain, poor coordination, balance problems, headaches, spasms and/or muscle tension, weakness of the left extremity, cognitive deficits and impaired sleep. Dr. Sohn also stated that Ringering had pain and spasms in her hands with decreased sensations, with the left hand worse than right.

Dr. Sohn listed functional limitations in the form but stated that they were "per patient." The listed functional limitations stated that Ringering could: sit for two hours in an eight-hour workday; stand for less than two hours in an eight-hour workday; and rarely lift less than 10 pounds and never lift 10 pounds or more; could rarely twist, stoop/bend, climb stairs, reach in all directions, or handle objects (gross manipulation); and could never crouch, climb ladders, finger (fine manipulation), or engage in feeling activities. The list also stated that Ringering: would need to shift positions at will and would need to take breaks hourly, each lasting 20 to 30 minutes; was frequently in sufficiently severe pain that interfered with her attention

and concentration; and would be absent from work more than three times per month because of her impairments.  R. 384-85.

Dr. Sohn stated that the limitations he noted on the form existed when Ringering stopped working on December 26, 2007, and prior to March 31, 2009.  R. 385.

On January 23, 2012,  Ringering saw Dr. Malik.  Ringering said she had a good Christmas and New Year's.  She said the meds were working.  She told Dr. Malik that in 1995 her fiancé killed himself in April.  Her fiancé's birthday was in February.  Since his death, in February she dreams that he is alive, and she runs into him.  She said her anxiety in the pm is down with less panic like symptoms.  She denied any insomnia.  She said her mood was more stable.  She denied any suicidal or homicidal ideations.  R. 787.

On March 28, 2012, Ringering saw Dr. Malik.  Ringering stated that her mood was more stable; her anxiety got high at times, her sleep was disturbed for the past two weeks; her concentration could be better; and she had fleeting suicidal or homicidal thoughts once a day, but no plan or intent.  R. 789.

On April 25, 2012, Ringering saw Dr. Malik.  She said that her mood was fairly stable, and she felt more upbeat.  Her anxiety was fair.  She

denied any suicidal or homicidal ideations.  She said the pain in her back woke her up.  R. 790.

On April 25, 2012, Ringering also saw Dr. Sohn.  Ringering said that her back pain had flared up.  She said her mornings were quite bad.  On examination, she was alert and in a stable mood.  Her stance, gait, and position changes appeared normal.  Her flexion was without discomfort, but her extension was poor to fair with pain in her right low back.  She was tender to palpation on the right lower back.  Her lower extremity strength was intact.  Dr. Sohn administered an injection for the pain.  Dr. Sohn recommended continuation of usual activities and exercises and advised against bedrest.  R. 710.

On August 29, 2012, Ringering saw Dr. Malik.  She said she felt depressed and blah, not motivated.  Her sleep was disturbed by her back problems.  She denied any suicidal or homicidal ideations.  R. 791.

On October 9, 2009, Ringering saw Dr. Sohn.  She said she had back spasms and pain in her left shoulder; pain radiating down her left arm; and some left-hand numbness, tingling, and shakiness.  On examination, she was alert and in a stable mood.  Her stance, gait, and position changes appeared normal.  Range of motion was decreased on left rotation with some stiffness and discomfort.  She was tender to palpation on the neck

and shoulder girdle.  She had some decreased light touch sensation in left thumb and first two fingers.  Dr. Sohn noted that a prior nerve conduction study was negative for carpal tunnel syndrome.  Dr. Sohn refilled Ringering's medications.  He recommended that she continue her usual activities and exercises and recommended against bedrest.  R. 712.

On December 14, 2012, Ringering saw Dr. Malik.  On examination, Ringering's appearance was disheveled; she was cooperative; she exhibited psychomotor retardation; her mood was sad and anxious; and her affect was constricted.  Her speech was normal, and her thought processes were logical, and goal directed.  Her thought content, memory, judgment, and insight were intact.  She exhibited normal cognition and average intelligence.  Suicidal thoughts were not present.  R. 793.

On February 18, 2013, Ringering saw Dr. Sohn.  Ringering said that her back pain seemed to be doing okay.  She reported increased pain in her mid to left neck and shoulder girdle.  She also had numbness and tingling in her left arm and hand.  On examination, she was alert and in a stable mood.  Her stance, gait, and position changes appeared a little slow and stiff.  She had tenderness on palpation on her left side.  She had pain in her left neck and shoulder girdle with neck flexion, extension, rotation, and side bending.  Range of motion was decreased in left neck rotation and

side bending.  Her upper extremity strength was intact without discomfort. She had decreased sensation to light touch in her left thumb and first three fingers.  Dr. Sohn administered four trigger point injections.  Dr. Sohn recommended against bedrest and Ringering agreed to remain active.  R. 714.

On March 20, 2013, Ringering saw Dr. Malik.  Ringering said she felt better on her current medications.  She said that her memory was better. Dr. Malik noted that Ringering had been doing fair since Dr. Malik started treating her in 2011.  She said that her anxiety was high, especially at night; her energy and motivation were better; she denied suicidal or homicidal thoughts; her medications improved her sleep; and her concentration was not good.  On examination, her appearance was disheveled; she was cooperative; her mood was sad and anxious; her affect was constricted; her speech was normal; her thought process was logical and goal directed; her thought content, memory, judgment, and insight were intact; and her cognition was normal. R. 794-95.

On June 17, 2013, Ringering saw Dr. Malik.  Ringering said her memory was better and she had more energy.  She was not having nightmares.  Ringering said that her mood was more upbeat; her anxiety was high; her energy and motivation were better, and she was doing more

of the housework; she denied any suicidal or homicidal ideations; and her concentration was improving. Ringering reported reading a book the prior weekend. On examination, her appearance was disheveled, but she had good eye contact and was cooperative. Her mood was anxious and euthymic; her affect was constricted; her speech was normal; her thought process was logical, and goal directed; her thought content, memory, judgment, and insight were intact; and her cognition was normal. R. 797-98.

On June 17, 2013, Ringering also saw Dr. Sohn. Ringering reported increased pain and spasm in her left shoulder girdle that radiated into her left arm and chest. She also said she was having minimal neck pain and her low back pain was "okay." On examination, she was alert and in a stable mood. Her stance, gait, and position changes appeared normal. She had tenderness to palpation on the left rhomboid. She had pulling in her left shoulder girdle with neck flexion, left rotation and left side bending, no other pain with neck movement. She had pain with left shoulder abduction. Her upper extremity strength was intact. No other pain with shoulder and back movement. Dr. Sohn administered two injections for pain. Dr. Sohn recommended continuing usual activities at home and home exercise program and advised against bedrest. R. 716.

On September 16, 2013, Ringering saw Dr. Malik. Ringering said her memory was better since her medicine was changed. She said she was having panic attacks. She had two that day. She said she was having financial problems and was worried about the bills. She said that her mood was better, more upbeat; her anxiety was high with panic attacks in p.m.; her energy and motivation was better, and she was doing more housework; she denied any suicidal or homicidal ideations; and her concentration was better. She read another book the prior weekend. On examination, her appearance was disheveled, but she had good eye contact and was cooperative. Her mood was anxious and euthymic; her affect was constricted; her speech was normal; her thought process was logical, and goal directed; her thought content, memory, judgment, and insight were intact; and her cognition was normal. R. 800.

On September 16, 2013, Ringering also saw Dr. Sohn's Advanced Nurse Practitioner (ANP) Misty Wheelock. Ringering said that the prior injections were very helpful. She said her pain was manageable with her oral medications. She noticed that she was sore for a day after household chores, but the soreness improved over time. The pain in her neck and left upper extremity, as well as the numbness and tingling, was tolerable. She reported minimal problems with her low back and hips. On examination,

station, gait, and position changes appeared normal.  She had mild tenderness to palpation of the left neck and shoulder girdle.  She had pulling in her left neck and shoulder girdle with neck flexion, right side bending, and right rotation.  She had no pain with other neck movements.  She had pain with internal and external shoulder rotation.  Her back flexion and extension were limited due to stiffness.  Her upper and lower extremity strength was intact.  R. 718-19.

On December 16, 2013, Ringering saw ANP Wheelock.  Ringering said she had a flare up of pain in her neck and shoulder girdle after doing household chores.  She said her pain had improved since then.  She reported that her low back and hip pain was manageable.  On examination, Ringering was in a pleasant, stable mood.  Her stance, gait, and position changes appeared normal.  She had tenderness on palpation in the neck and shoulder girdle.  She had pulling in the left neck and shoulder girdle with neck flexion, right rotation and side bending, but no pain or pulling with other neck movements.  She had some pain with shoulder abduction, but not with other shoulder movements.  Her upper extremity strength and sensation were intact.  Wheelock continued Ringering's medication and recommended continuing usual activities and exercises and advised against bedrest.  R. 720-21.

On March 21, 2014, Ringering saw ANP Wheelock.  Ringering reported increased pain in her left neck and shoulder girdle.  She had been waking up with pain in her left third and fourth digits.  She also reported numbness in her left arm, thumb, and second and third digits.  She had more right low back pain.  She said that her pain depended on her activity level.  On examination, Ringering was alert, pleasant, and in a stable mood.  Her stance, gait, and position changes were a little slow and stiff.  She had increased tenderness in her neck and shoulder muscles and pain with flexion, left rotation, and right side bending of her neck.  Her lower extremity strength was intact.  Ringering said she had been doing house cleaning because her children were coming home from college.  Ringering declined trigger point injections.  Wheelock recommended exercises for core conditioning on a daily basis.  Wheelock said Ringering should remain as active as possible and recommended against bedrest.  R. 722-23.

On April 23, 2014, Ringering saw Dr. Malik.  Ringering said that her memory was better with the past medication change.  She said that she was doing better except for panic attacks. Her mood was still down; her anxiety was high with panic attacks in the p.m.; her energy and motivation were better and she was doing more housework; she denied any suicidal or homicidal thoughts; and her concentration was better and she again read a

book the prior weekend.  On examination, her appearance was disheveled, but she had good eye contact and was cooperative.  Her mood was anxious and euthymic; her affect was constricted; her speech was normal; her thought process was logical, and goal directed; her thought content, memory, judgment, and insight were intact; and her cognition was normal. R. 803-04.

On June 13, 2014, Ringering saw ANP Wheelock.  Ringering said she was having a flare-up of pain in her neck and shoulder girdle, as well as pain radiating into the left arm with numbness and tingling in the thumb and fingers of her left hand.  She said that her low back pain was doing well.  On examination, she was alert, pleasant, and in a stable mood.  Her stance, gait, and position changes appeared normal.  She had tenderness in the neck and shoulder muscles.  She had pain with neck flexion, left rotation, and right-side bending, with minimal pain on extension.  Her upper extremity strength and sensation were intact.  Wheelock administered trigger point injections for pain.  Ringering was advised to remain active and against bedrest.  R. 724.

On July 23, 2014, Ringering saw Dr. Malik.  Ringering said she was not motivated since the end of May.  She said that she was not eating well. She denied any suicidal or homicidal ideations.  R. 806.

On September 12, 2014, Ringering saw ANP Wheelock.  Ringering said the trigger point injections were very helpful for about a month.  She said that the pain returned to her left shoulder girdle, radiating into her left elbow.  She had numbness and tingling in the left thumb and first two fingers.  On examination, she was alert, pleasant, and in a stable mood.  Her stance, gait, and position changes appeared normal.  She had tenderness in the left rhomboid and pain on some motion of her neck and both shoulder girdles.  Her upper extremity strength and sensation was intact.  R. 726.  Wheelock administered two trigger point injections.  Wheelock recommended remaining active and against bedrest.  R. 726-27.

On October 22, 2014, Ringering saw Dr. Malik.  She reported that she had been feeling depressed and had been a little listless.  She reported that her mood was down; her anxiety was high with some panic attacks in the p.m.; her energy and motivation was better, and she was doing more housework; she denied any suicidal or homicidal ideations; her sleep was better; and her concentration was better.  She said she read a book the prior weekend.  On examination, her appearance was disheveled, but she had good eye contact and was cooperative.  Her mood was anxious and euthymic; her affect was constricted; her speech was normal; her thought process was logical, and goal directed; her thought content, memory,

judgment, and insight were intact; and her cognition was normal. R. 807-08.

On December 12, 2014, Ringering saw Dr. Malik. She said her depression had "a hold of her." She said that she could not get out of bed and she felt blah. Her mood was depressed; her anxiety was poor; her energy and motivation were low; she denied suicidal and homicidal ideations; and her sleep was not good. R. 809.

On December 12, 2014, Ringering also saw ANP Wheelock. Ringering said the trigger point injections were helpful for three to four weeks. Ringering said she manually washed her floors several weeks earlier which resulted in a flare up of pain. She said that the pain was improved. She said that her pain had settled down and she managed it reasonably well with oral medication. She still had numbness and tingling in her left hand and digits. On examination, she was alert, pleasant, and in a stable mood. Her stance, gait, and position changes appeared normal. She had mild tenderness on palpation in her neck and shoulder girdle. Her upper extremity strength and sensation remained intact. Wheelock advised that she remain as active as possible and advised against bedrest. R. 727-28.

On March 13, 2015, Ringering saw Dr. Malik.  Ringering reported that she had some ups and downs related to the weather.  She was dealing with her father who was hospitalized and confined to a wheelchair.  Ringering's mood was generally stable except for some effects from the weather; her anxiety was up; her concentration was fair; her energy and motivation varied with the weather; and she denied any suicidal or homicidal ideations.  R. 810.

On March 13, 2015, Ringering also saw ANP Wheelock.  Ringering said her low back was doing fairly well.  She said her pain flared up in her neck and shoulder girdle.  She believed the flare up was due to the wet weather.  On examination, she was alert, pleasant, and in a stable mood.  Her stance, gait, and position changes appeared normal.  She had tenderness in her shoulder girdle and pain with neck rotation and side bending, but not other neck movements.  Her upper extremity strength and sensation remained intact.  Wheelock administered three trigger point injections.  Wheelock recommended that Ringering remain active and advised against bedrest.  R. 730-31.

On August 19, 2015, Ringering saw Dr. Malik.  She said her father died in April 2015.  Ringering said her mood had been depressed, her anxiety was very high,  her energy and motivation was low, she denied any

suicidal or homicidal ideations, and she was waking up in the middle of the night.  On examination, her depression and anxiety were moderate; she was alert, her grooming and eye contact were fair, her speech was normal, and she was cooperative; her mood was depressed and anxious; her affect was constricted; her though process was linear and logical; her thought content included paranoia; and her insight and judgment were fair.  R. 811.

On September 1, 2015, Ringering saw ANP Wheelock.  Ringering said she had neck, shoulder girdle, and low back pain after performing household chores.  The pain occasionally radiated down her left arm into her left hand.  She had residual numbness and tingling in her left hand and fingers.  She slept well.  Ringering said she planned to go to California in October to see her son and "upcoming" grandchild.  On examination, she was alert, pleasant, and in a stable mood. Her stance, gait, and position changes appeared normal.  She had tenderness in her left neck and shoulder girdle.  She had pulling and pain with neck extension, left rotation, and left bending.  Her upper extremity strength and sensation was intact. Wheelock renewed her prescriptions, advised her to remain as active as possible, and advised against bedrest.  R. 734-35.

On December 7, 2015, Ringering saw Dr. Malik.  Ringering said she was doing well in general.  She denied any relapse of depression

symptoms. She denied any suicidal or homicidal ideations. She said her sleep, energy, motivation, and concentration were fair.  On examination, her depression and anxiety were moderate; she was alert, her grooming and eye contact were fair, her speech was normal, and she was cooperative; her mood was depressed and anxious; her affect was constricted; her though process was linear and logical; her thought content included low self-esteem; and her insight and judgment were fair.  R. 811.

On December 7, 2015, Ringering also saw ANP Wheelock.  She said she had increasing pain in her left neck and shoulder girdle after she watched television for extended periods on Thanksgiving.  She had numbness in her left thumb and first and second finger.  On examination, she was alert, pleasant, and in a stable mood. Her stance, gait, and position changes appeared normal.  She had pulling with neck flexion, extension, rotation, and side bending.  Her upper extremity strength and sensation was intact.  Wheelock administered trigger point injections. Wheelock advised her to remain as active as possible and against bedrest. Wheelock gave Ringering a sheet explaining exercises for core conditioning.  R. 736-37.

On March 7, 2016, Ringering saw Dr. Malik.  Ringering said she was doing fine.  She has been feeling blah, but not depressed.  She was not

doing much at all, but she did clean the house. Her anxiety was in control, but was high at night and interfered with her sleep; her concentration was good and she had been able to read; her energy and motivation were low, and she was showering every five days; she denied any anger or suicidal or homicidal ideations; and she admitted some impulsive shopping. R. 813.

On March 7, 2016, Ringering also saw ANP Wheelock. Ringering said the injections were helpful. She said she had some flare-ups, but the pain was manageable. She still had some numbness and tingling in her left upper extremity. On examination, she was alert, pleasant, and stable. Her stance, gait, and position changes appeared normal. She had pain and pulling on neck rotation and side bending, but not other movements. She also had pain on external shoulder rotation. Upper extremity strength and sensation was intact. Wheelock recommended remaining as active as possible and against bedrest. Wheelock refilled her pain medication prescriptions. R. 738-39.

On June 10, 2016,Ringering returned to see Wheelock. She said she had pain flare-ups the past three weeks and some numbness in her left hand and fingers. Wheelock's examination was the same as on March 7, 2016. Wheelock administered trigger point injections. Wheelock

recommended remaining as active as possible and against bedrest. Wheelock refilled her pain medication prescriptions. R. 740-41.

On July 18, 2016, Ringering saw Dr. Malik. Ringering said she was feeling better, she woke up in the middle of the night, her energy and motivation were low, and she denied any suicidal or homicidal ideations. On examination, Dr. Malik assessed moderate depression and moderate anxiety. Ringering was alert, her grooming and eye contact were fair, her speech was normal, and she was cooperative; her mood was depressed and anxious; her affect was constricted; her thought process was linear and logical; her thought content included low self-esteem; and her insight and judgment were fair. R. 814.

On September 12, 2016, Ringering saw ANP Wheelock. Ringering reported that the trigger point injections were affective. She reported constant aching in her neck and shoulder girdle, but said her medications made the pain more manageable. She still had numbness in her left hand and fingers. She reported dropping things. Wheelock noted that the prior EMG/nerve conduction study was normal. Ringering reported some additional pain in her right low back and hips. She had cramping in her right calf and toes with stretching or walking greater than one mile. On examination, she was alert, pleasant, and in a stable mood. Her stance,

gait, and position changes were a little slow and stiff. She had tenderness in her lower back and stiffness on back flexion. Her back extension was poor. Her neck range of motion was poor to fair due to stiffness and pulling on rotation and side bending. Her sensation was decreased to light touch to her left first, second, and third fingers. Her grip strength was normal bilaterally. Wheelock referred Ringering to physical therapy, recommended that she stay as active as possible, and recommended against bedrest. R. 742-43.

On November 4, 2016, Ringering saw Dr. Malik. Ringering said that her sleep was improved, and her mood was better. On examination, her grooming and eye contact were fair, her speech was normal and coherent, and she was cooperative; her affect was constricted; her thought process was logical and was not distractible; and her insight and judgment were fair. R. 816.

On November 8, 2016, Ringering saw Advanced Practice Nurse (APN) Corey Meyer, for monitoring of high blood pressure. Meyer worked with Dr. Douglas Byers, M.D. Ringering had been seen by Dr. Byer's office since March 15, 2011, primarily for maintenance of high blood pressure. R. 818-69. Ringering reported that she was doing well and had no problems or concerns. Meyer's examination of Ringering was normal. Meyer

recommended weight loss, daily exercise and healthy diet to improve blood pressure. Meyer continued her blood pressure medication prescriptions. R. 824.

On December 2, 2016, APN Meyer completed a residual functional assessment of Ringering. R. 770-73. The assessment was based on four office visits since April 8, 2016. Meyer diagnosed a single episode of back pain. Meyer rated her prognosis as good. Meyer's objective examination was normal. Meyer noted that Ringering did not follow-up after initial visit for back pain. R. 770.

## THE EVIDENTIARY HEARING

On December 5, 2016, the Administrative Law Judge (ALJ) held a second evidentiary hearing after the August 4, 2015, remand. R. 449-96. Ringering appeared in person and with her attorney. Vocational expert Jeffrey Magrowski also appeared. R. 451.

Ringering testified first. Ringering said she was married and lived with her husband. She stated that in 2007 when she last worked, she lived with her husband and their five children. R. 454. Ringering listed the jobs she worked since 1994. She did office work at car dealerships from 1994 to 1998, and then again from 2001 to 2005. She worked at a gas station waiting on customers part time in 2007, and she worked for Walmart part

time in 2007 until she quit.  R. 454-58.  She left the job in 1998 because she was pregnant with twins and could not afford daycare.  In 2005, her job was eliminated due to a merger of her employer with another company.  She said she quit the two part time jobs in 2007 because of her anxiety.  She said she became frustrated and annoyed.  She testified, "[I] don't know where those feelings come from.  They just happen over time and I can't – I didn't want to be around people anymore.  They were – I just couldn't do it."  R. 456.

Ringering testified that she started seeing Dr. Nigam in 2007 because of depression and mania.  She said she was getting out of control.[6]  She indicated that Dr. Nigam had her on the wrong medications and would only increase the dosage but would not change the medication.  She felt she was getting worse.  R. 459-60.  She started seeing Dr. Datta in May 2008.[7]  She said she did better with Dr. Datta.  She said he sent her to therapy.  R. 460.

Ringering testified that during her manic episodes she did not sleep much, she got things done, but she was "out of sorts" and would do things she would not normally do and associate with people she would not

---

[6] The Court Reporter spelled Dr. Nigam's name phonetically as Dr. Nydum.  R. 459.
[7] The Court Reporter spelled Dr. Datta's name phonetically as Dr. Dada.  R. 460.

normally associate with. Her longest manic period lasted almost a year in 2007. R. 461. She said she had suicidal thoughts and drank heavily when she was in a manic episode. R. 462. She hung out in bars, and her husband was about to leave her over her behavior. R. 463.

Ringering said that Dr. Datta helped control the manic episodes by changing her medications. She quit drinking in 2008 after Dr. Datta changed her medication. Ringering testified that she started having more depression. R. 461-62. During her depressive episodes she did not get out of bed, she slept a great deal, she did not shower for days, she did not get involved with the children, and she did not do any housework. R. 463. She stayed in bed five out of seven days a week. She said that was true in 2008 and 2009. R. 475. During this time, she did not shower for four to six days in a row. Her husband would make her shower. She was not motivated to do housework, and was tired all the time. She slept 12 to 16 hours a day. Her medication made her sleepy. She did not help her children with school projects, and did not attend any school functions. She did laundry but did not do any other housework. She was afraid to change her medication because she did not want the mania to return. She said her husband would leave her if the mania returned. R. 463-65.

Ringering testified that at the time of the hearing, she had panic attacks two to five times a day. She could not remember how frequently she had panic attacks in 2007-2009. She said she was on Klonopin for her panic attacks. The Klonopin helped by taking away palpitations and breathing issues. She took Klonopin five times a day on a regular schedule. R. 466.

Ringering said she was arrested for DUI in 2008 because she was in a manic episode and had been drinking. During this time, she had mood swings from minute to minute, going from calm to violent to crying and upset. R. 467.

She said she got anxiety attacks when she was around people. The size of the group of people did not matter. She got anxiety attacks being around one other person. She did not leave her house often. The only place she went was the doctor's office and to see her mother. She saw her mother once or twice a month. R. 474. She also went to Thanksgiving and Christmas gatherings at her mother's house. R. 481-82. Ringering had one friend. She talked to the friend regularly over the phone. She said she cried four to five times a day. Her tendency toward crying had gotten worse since 2008 and 2009. R. 474.

Ringering said that she injured her upper back in 2008. She had surgery. The surgery helped for a while and took the pain away. When she went back to her normal routine a couple of months after the surgery, the pain returned. R. 467-68.

Ringering then started seeing a pain specialist, Dr. Sohn. She said that in addition to the back pain, she had pain and numbness in her thumb and first two fingers of her left hand. The "shooting pains" were more "tense". She also said that her back spasms were more frequent. She had spasms twice a day. R. 468-69. She got a pulling sensation in her back when she reached out to the side with either arm. Anxiety caused her to have back spasms. She also had difficulty sweeping, vacuuming, and dusting. R. 471.

Ringering said that she had problems buttoning clothes and problems holding on to objects with her left hand. Her hand relaxed and she dropped the object. She said, "It just – I can't pick anything up. I can't – I just drop things out of my hand." She had a hard time with zippers, buttons, and tying shoes. She did not open jars, her husband did that. R. 469-70. Carrying a gallon of milk was painful. R. 476.

Ringering said that she experienced stiffness in her hands and upper back. She could not turn her head to the right for very long. She had

"limited mobility" when she turned her head to the left.  She did not have much pain or difficulty looking down.  R. 470.

Ringering stated "As far as I can remember, yeah," her pain was the same in 2007-2009.  R. 469.  Ringering said she was on pain medication and received shots for her pain.  The shots helped for a couple of weeks.  R. 471.  She said that heating pads and ice packs helped with flare-ups of neck pain.  R. 477.

Ringering's pain medications caused memory loss.  She also said she had difficulty concentrating.  She got distracted easily.  She testified that her memory loss and difficulty in concentration was true in 2007-2009.  R. 472.

Ringering said sitting straight up helped with the back pain.  R. 477.  She also said, however, that sitting at the hearing caused pain in her upper back across her shoulder blades.  She could sit in a chair like the ones at the hearing for 15 to 20 minutes.  R. 479.

Ringering said she did not have very good balance.  She fell over easily.  R. 479-80.

The ALJ asked Ringering about notes in medical records that indicated that she was very active in the summer of 2009.  Ringering said she was remodeling a house.  She was painting and scraping off wallpaper

about three days a week from 9:00 a.m. to 1:00 p.m. or 2:00 p.m.  Her

mother and sister helped her.  She said she started hurting after two hours

of painting and scraping.  She started having back spasms.  She took

breaks while painting and scraping wallpaper.  R. 483-84.  She painted and

scraped wallpaper in June and part of July 2009.  R. 480.  She painted her

living room, two bedrooms, and a bathroom.  Her pain started bothering her

again when she was doing the remodeling.  Her mother and sister finished

what she was doing.  R. 482.

The ALJ also asked Ringering about notes in the medical records that

she traveled to Texas and Florida.  Ringering said she traveled to Texas in

2008 for her stepson's Airforce graduation.  She drove her mother and her

children to Florida in 2009 in two days.  R. 481.  Ringering said that she

had to stop often and get out of the car and  walk.  R. 481-82.

The vocational expert Magrowski then testified.  Counsel did not

object to Magrowski's qualifications.  R. 486.  The ALJ asked Magrowski

the following hypothetical question:

> All right.  First hypo, I need you to assume a younger
> individual under the age of 50 with a 12th grade education, past
> work history that we've gone over in the testimony. This light
> hypo 20 pounds occasionally/10 pounds frequently; standing
> and walking a total of six hours in eight; sitting a total of six
> hours in eight; the person would need to change position for
> about two minutes once an hour; with the non-dominant left
> arm, no overhead tasks; balancing, kneeling, crouching,

crawling, stooping, ramps and stairs are occasional; no ladders, ropes, or scaffolds okay, no, ladders, ropes, or scaffolds; with the non-dominant left arm, reaching, handling, and fingering are frequent, but not constant; a person could do simple, routine tasks; they need to be tasks that would involve working primarily with things rather than other people; tasks that can be done independently; beyond that, any social interaction needs to be with coworkers and supervisors only, superficial; no mediation, arbitration, confrontation of others, supervision of others; no direct interaction with the general public.

Starting with that, are there any occupations that such person could do?

R. 487. Magrowski opined that such a person could perform occupations such as bagger of clothing or garments, with at least 25,000 in the national economy; packer, with at least 100,000 in the national economy; and labeler with at least 5,000 in the national economy. R. 487-88.

The ALJ asked Magrowski to assume the person also was limited to occasional reaching, handling, or fingering with the non-dominant arm and hand. Magrowski opined that the three jobs he listed would be eliminated, but such a person could work as a bakery worker, with at least 25,000 in the national economy; weight tester, with at least 5,000 in the national economy; and surveillance system monitor, with at least 5,000 in the national economy. R. 488.

Magrowski said that individuals in the jobs he listed could have three to five unexcused absences a year. R. 489. He said that a person could be off task 10 to 12 percent outside of normal breaks and keep

employment in the jobs listed.  Magrowski said that if, every week, a person either arrived late, left early, or took an extra 15-minute break, then the person would be warned once or twice and then fired.  R. 491.

Magrowski said that if the person could not use his left arm at all, he could not work.  R. 494-95.  He also said that shifting from a sitting position to standing briefly while still working would not be a problem with the jobs listed.  R. 495.  The hearing concluded.

## THE DECISION OF THE ALJ

The ALJ issued his decision on May 12, 2017.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1

(Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Ringering met her burden at Steps 1 and 2.  She was not employed from December 26, 2007 to the date she was last insured for Disability Benefits March 31, 2009.  She suffered from the severe impairments of degenerative disc disease, bipolar disorder,

posttraumatic stress disorder, and alcohol abuse. R. 426. At Step 3, the ALJ found that Ringering's impairments or combination of impairments did not meet or medically equal a Listing. The ALJ considered Listing 1.04 for disorders of the spine, and Listings 12.04 for affective disorders including bipolar disorder, and 12.06 for anxiety disorders. Listings 12.04 and 12.06 were amended effective January 17, 2017. 81 Fed. Reg. 66138, 66138 (September 26, 2016). The ALJ applied the amended Listings. Under the amended Listings 12.04 and 12.06, Ringering needed to have at least one extreme limitation or two marked limitations in the areas of (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; or (4) adapting or managing themselves. R. 427.

The ALJ found that Ringering was moderately restricted in understanding, remembering, or applying information. The ALJ relied on the fact that Ringering was able to perform tasks such as housework and remodeling, as well as driving her mother and children to Florida. R. 427.

The ALJ found that Ringering was moderately restricted in social functioning. The ALJ found that she had difficulty dealing with the public or supervisors and avoided shopping. The ALJ found the moderate limitations because she lived with a husband and five children, she attended doctor's

appointments and family get togethers, she attended her stepson's Airforce graduation out of town in 2008, she drove her mother and children to Florida, and she regularly visited with her mother and regularly talked to a friend on the phone.  R. 427.

The ALJ found that Ringering was moderately restricted in concentrating, persisting, or maintaining pace with respect to detailed and/or complex tasks.  The ALJ relied on the fact that she did housework, she remodeled her home in 2009, and only quit because of physical impairments, not mental impairments.  R. 427.

The ALJ found that Ringering was mildly restricted in adapting and managing herself.  The ALJ said that she lived with a husband and 5 children, she took care of her personal care, she did housework, she traveled, she attended family events.  The ALJ noted that according to her testimony, she was limited in performing sweeping, vacuuming, and dusting due to her physical impairments, not her mental impairments.  R. 428.  The ALJ further found no evidence of any extended episodes of decompensation.  R. 428.

The ALJ rejected Dr. Datta's March 4, 2010 opinion that Ringering's mental impairments met Listing 12.04.  The ALJ said that Dr. Datta's medical notes were inconsistent with his opinion.  The ALJ noted that Dr.

Datta's notes stated that Ringering engaged in housework, remodeling, and caring for children. The notes stated that Ringering also engaged in biking. The ALJ also relied on the evidence in the record that Ringering could maintain sufficient persistence and pace to drive to Florida. The ALJ also said that the evidence did not show any repeated episodes of decompensation and no evidence of hospitalizations lasting two or more weeks. The ALJ concluded that Dr. Datta failed to provide sufficient objective clinical evidence to support his opinion. R. 438-39.

At Step 4, the ALJ found that Ringering had the following RFC:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except though she could lift/carry up to 20 pounds occasionally and 10 pounds frequently and stand/walk 6 hours and sit 6 hours in an 8-hour workday, she needed to change positions for 2 minutes once per hour. She could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. She was unable to climb ladders, ropes, or scaffolds. She was unable to perform overhead tasks with the nondominant left upper extremity. She could frequently but not constantly reach in other directions, handle, and finger ·with the left upper extremity. She could perform simple and routine tasks that can be performed independently and involve working primarily with things rather than people. She was limited to no more than superficial interaction with coworkers and supervisors and no direct interaction with the public. Superficial is defined as involving no negotiation, confrontation of others, mediation, arbitration, or supervision of others.

R. 428.  The ALJ relied on the medical records from Drs. Nigam, Datta, and Malik that showed that Ringering had the mental capacity to engage in the limited work described in the RFC.  The ALJ relied on the medical records from these psychiatrists that showed Ringering took care of her family and her house, took trips, and remodeled the house.  R. 429-34.  The ALJ also relied on the numerous findings by these psychiatrists that Ringering had GAF scores of 55 and above, indicating moderate mental symptoms of functional limitations.  R. 440.  The ALJ also relied on Dr. Sohn's repeated recommendations that Ringering remain active and engage in exercise, her ability to take care of her family, as well as her ability to attend family gatherings, travel to Texas, drive to Florida, and scrape wallpaper and paint three times a week from 9:00 a.m. to 1:00 or 2:00 p.m.  R. 434-39.  The ALJ found that Ringering's testimony was not consistent with the medical evidence and the other evidence in the record.  R. 430.

The ALJ gave limited weight to the opinions of state agency psychologists Drs. Hill and DiFonso.  The ALJ said he relied rather on the treatment records from Drs. Nigam, Datta, and Malik.  R. 438.

The ALJ said that Dr. Malik's August 22, 2011 medical source statement and related opinions were of limited relevance because Dr. Malik limited his opinions to the time he treated her beginning in 2011, more than

two years after Ringering's date last insured.  The ALJ also noted that Dr. Malik's opinions were inconsistent with some of his treatment notes. The ALJ said he gave greater weight to the treatment notes.  R. 439.

The ALJ also did not accept the opinions in Dr. Sohn's October 31, 2011 questionnaire because they were inconsistent with his treatment notes.  The ALJ also rejected the functional limitations on the medical source statement because they came from the claimant's assessment, not Dr. Sohn's expert opinion.  R. 439-40.

The ALJ found at Step 4 that Ringering was unable to perform her past relevant work.  At Step 5, the ALJ found that she could perform a significant number of jobs in the national economy.  The ALJ relied on the RFC finding; the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2; and the opinions of vocational expert Magrowski. R. 441-42.  The ALJ concluded that Ringering was not disabled.  R. 442.

Ringering appealed to the Social Security Appeals Council.  On March 2, 2018, the Appeals Council found no reason to assume jurisdiction.  The decision of the ALJ then became the final decision of the Commissioner.  R. 386-87.  Ringering then filed this action for judicial review.

ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record. See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016). The ALJ must articulate at least minimally her analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The decision regarding Ringering's function limitations due to her mental impairments was supported by substantial evidence. The ALJ's

decision at Step 3 that Ringering's impairments or combination of impairments did not meet or medically equal Listing 12.04 or 12.06 was supported by the treatment notes of Drs. Nigam, Datta, and Malik, including: (1) the description of Ringering's activities; (2) the assessments of her mental status; and (3) the GAF scores that were generally above 50, indicating moderate symptoms or functional limitations.

This same evidence also supported the ALJ's decision not to give weight to Dr. Datta's March 4, 2010 opinion that Ringering's impairments met Listing 12.04. The ALJ must give the opinions of a treating physician controlling weight if the opinions are supported by objective evidence and are not inconsistent with other evidence in the record. 20 C.F.R. § 404.1527(d)(2); Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008).[8] Dr. Datta's opinion was inconsistent with his own mental status examinations and GAF scores, and inconsistent with the mental status examinations and GAF scores of Drs. Nigam and Malik.[9] Substantial evidence supported the

---

[8] The Commissioner recently changed the regulations regarding the interpretations of medical evidence. The amendments, however, apply prospectively to claims filed on or after the amendment's effective date of March 27, 2017. Revisions to Rule Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, at 5844-45 (January 18, 2017). As such, the amendments do not apply here.

[9] The medical records also contained no evidence of repeated episodes of decompensation each of extended duration. Dr. Datta referred to the Listing in effect prior to January 17, 2017 revision. The prior Listing included in Paragraph B a consideration of whether the person had repeated episodes of decompensation each of extended duration. To qualify, the person must have experienced at least three episodes in a year. Former Listing 12.00(C)(4). Dr. Datta stated in his opinion that Ringering had one or two episodes of decompensation. R. 271. No medical records show three episodes in any year.

ALJ's determination that Ringering's impairments or combination of impairments did not meet a Listing, including Listing 12.04.

The mental aspects of the ALJ's RFC finding was also supported by substantial evidence. The treatment notes of Drs. Nigam, Datta, and Malik again support the finding that mental status examinations and GAF scores provide substantial evidence to support the ALJ's limitations in the RFC that,

> She could perform simple and routine tasks that can be performed independently and involve working primarily with things rather than people. She was limited to no more than superficial interaction with coworkers and supervisors and no direct interaction with the public. Superficial is defined as involving no negotiation, confrontation of others, mediation, arbitration, or supervision of others.

R. 428. Ringering reported to these doctors that she could perform routine household tasks, could take care of children, and could remodel her home and drive extended distances. The ALJ correctly noted that Ringering never indicated that her mental limitations affected her ability to perform any of these tasks. The treatment notes also contained mental status examinations that supported the ALJ's finding she had intact memory, adequate insight and judgment. The GAF scores, generally above 50, support the inference that she had moderate to mild symptoms or

functional limitations. All of this evidence supported the mental aspect of her RFC.

The ALJ's finding that Ringering's testimony was not consistent with the medical evidence and other evidence in the record was also supported by substantial evidence. Ringering's testimony regarding her symptoms and her activities was inconsistent with the level of activity she reported to her doctors during the relevant periods in 2007, 2008, and 2009, when she was insured for Disability Benefits. The ALJ's recitation of her testimony and the conflicting information in the medical treatment notes provided substantial evidence for his finding.

The ALJ's physical limitations of the RFC, however, were not supported by substantial evidence. The ALJ found that:

> [T]he claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except though she could lift/carry up to 20 pounds occasionally and 10 pounds frequently and stand/walk 6 hours and sit 6 hours in an 8-hour workday, she needed to change positions for 2 minutes once per hour. She could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. She was unable to climb ladders, ropes, or scaffolds. She was unable to perform overhead tasks with the nondominant left upper extremity. She could frequently but not constantly reach in other directions, handle, and finger ·with the left upper extremity.

R. 428. The ALJ relied on the treatment notes from Dr. Sohn, as well as the other treatment notes that identified her activity level, including

remodeling a home and driving for extended periods.  R. 439-40.  The ALJ
relied on similar evidence in the first decision.  <u>See</u> <u>ALJ Decision dated
May 20, 2011</u>, at 33-34.  This Court found that this evidence was
insufficient to support a physical RFC finding under the facts of this case.
<u>Ringering I Opinion</u>, at R. 543-45.  Pursuant to the Ringering I Opinion, the
ALJ erred in using substantially the same evidence to support the physical
aspect of the RFC.  The ALJ on remand must secure a medical expert
opinion, or other competent evidence, on Ringering's physical RFC from
the date she allegedly became disabled, December 26, 2007, until her date
last insured, March 31, 2009.

Substantial evidence, however, supported the ALJ's rejection of the
functional limitation opinions in Dr. Sohn's October 31, 2011 questionnaire.
Dr. Sohn noted that the functional limitation opinions were "per patient,"
and so, were Ringering's opinions and his.  The functional limitations listed
in the October 31, 2011 questionnaire, therefore, were not medical
evidence at all.  On remand, the ALJ will need to secure medical evidence
to determine Ringering's physical RFC from December 26, 2007, to March
31, 2009.

Ringering argues that all of the ALJ's decision must be reversed.
She argues that the ALJ failed to comply with the <u>Ringering I Opinion</u> in

several other respects, not just the physical RFC finding.  Ringering argues the ALJ failed to consider adequately Dr. Datta's treatment notes.  The Ringering I Decision noted that Dr. Datta's handwriting was very difficult to read and found that the record based on his examination and treatment of Ringering was not adequately developed.  The Ringering I Opinion noted that state agency psychologist Hill and DiFonso seemed to rely on a single treatment note dated March 30, 2009.  See Ringering I Opinion, at 541-42.

The ALJ took great pains in the 2017 decision to carefully and thoroughly review Dr. Datta's notes and gleaned information from almost each and every treatment note during the entire time he treated Ringering from October 20, 2008 to December 2, 2010.  R. 431-433.  The ALJ followed this Court's direction to develop the record of Dr. Datta's treatment of Ringering.  There was no error in this respect.

Ringering argues the ALJ violated the Ringering I Opinion by placing too much reliance on the opinions of Drs. Hill and DiFonso.  See Ringering I Opinion, at 540-41. The Court disagrees.  The ALJ did not rely on the opinions of Drs. Hill and DiFonso.  The ALJ clearly stated that he relied on the treatment notes of Drs. Nigam, Datta, and Malik.  R. 438.  The ALJ complied with the finding in the Ringering I Opinion on this point.

Ringering argues that the ALJ violated the <u>Ringering I Opinion</u> by rejecting Dr. Datta's opinion without adequately evaluating Dr. Datta's treatment notes. <u>Ringering I Opinion</u>, at 542. As discussed above, the ALJ extensively reviewed and considered Dr. Datta's treatment notes in his current decision. The ALJ fully considered Dr. Datta's treatment notes. The ALJ complied with the <u>Ringering I Opinion</u> in this respect.

Ringering argues that the ALJ again failed to consider Dr. Malik's treatment notes in 2008 and 2009. See <u>Ringering I Opinion</u>, at 543. The Court again disagrees. The ALJ extensively and thoroughly examined and discussed Dr. Malik's treatments notes. The ALJ complied with this aspect of the <u>Ringering I Opinion</u>.

Ringering also argues that the ALJ erred in not giving greater weight to Dr. Malik's August 22, 2011 opinions. The Court sees no error. Dr. Malik offered no opinion on Ringering's condition or functional limitations prior to when he started treating Ringering in 2011, two years after her last date insured of March 31, 2009. The ALJ further explained in detail how the opinions were not consistent with his treatment notes. R. 439. The Court sees no error in the ALJ's treatment of Dr. Malik's opinions.

Ringering argues that the ALJ improperly cherry-picked the evidence to support his findings. The Court disagrees. The ALJ thoroughly

discussed all the material medical evidence submitted from 2007 to 2016. He did not cherry-pick the evidence. Ringering essentially asks the Court to reweigh the evidence. This the Court cannot do. See e.g., Jens, 347 F.3d at 212; Delgado v. Bowen, 782 F.2d at 82. The ALJ failed to develop additional medical evidence on Ringering's physical RFC as required by the Ringering I Opinion, but he did not cherry-pick the evidence with respect to any issue.

Ringering argues that the ALJ failed to properly evaluate her credibility. The ALJ followed the Commission's direction not to make a credibility determination. SSR 16-3p, 2016 WL 1119029, at *1. Rather, the ALJ properly evaluated Ringering's statements regarding the intensity, persistence, and limiting effect of symptoms in light of the evidence as a whole:

> If an individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and the other evidence of record, we will determine that the individual's symptoms are more likely to reduce his or her capacities to perform work-related activities . . . . In contrast, if an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities . . . .

SSR 16-3p, 2016 WL 1119029, at *7.  The ALJ considered Ringering's testimony in light of all the evidence and determined that her symptoms were less likely to reduce her capacity to perform work related activities. As explained above, substantial evidence supported that decision.

THEREFORE, IT IS ORDERED that Plaintiff Julia Ringering's Motion for Summary Reversal (d/e 16) and Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 21) are ALLOWED in part and DENIED in part.  The Decision of the Commissioner is AFFIRMED except with respect to the determination of Ringering's physical residual functional capacity.  The case is REMANDED to develop the record on her physical residual functional capacity.  This judgment and remand are entered pursuant to 42 U.S.C. § 405(g) sentence four.

ENTER:   August 29, 2019

s/ *Tom Schanzle-Haskins*

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE